## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **EVELYN L. MILES,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **2:08 - CV - 2220 - KOB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On January 11, 2005, Claimant, Evelyn L. Miles, applied for supplemental security income under Title XVI of the Social Security Act (SSA), alleging disability commencing on the same date.[1](R. 50-52). On June 30, 2005, the state agency denied her claim. (R. 32-34). Consequently, she requested a hearing before an Administrative Law Judge (ALJ), which was granted on July 20, 2007. (R. 39-40). On October 4, 2007, the ALJ heard the matter in Birmingham, Alabama. (R. 40-43, 220-256). In a decision dated April 7, 2008, the ALJ found that Claimant was not disabled under the SSA and thus, ineligible for benefits. (R. 14-30). On October 1, 2008, the Appeals Council denied Claimant's request for review and, as a result, the ALJ's decision became the final decision of the Commissioner. (R. 3-5). Claimant has exhausted

---

[1] This case is Claimant's sixth application for disability benefits. She was previously denied benefits on separate occasions in July and August 1978, August 1980, August 1998, and January 2000. (R. 60-61). The state agency initially denied her applications in 1978 and 2000. *Id.* An ALJ denied her claims in 1980 and 1998 after holding hearings. *Id.*

1

all administrative remedies. This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUE PRESENTED

The issue presented is whether the ALJ properly considered Claimant's alleged mental

impairment, either singly or in combination with her other alleged impairments.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must

affirm the decision if the ALJ applied the correct legal standards and if the factual conclusions

are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420,

1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No [...] presumption of validity attaches to the [Commissioner's] legal conclusions

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*.

Instead, this court will affirm those supported by substantial evidence. "Substantial evidence" is

"more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971)(quoting

*Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)). This court must "scrutinize the record

in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*,

826 F.2d at 999. It must take account of evidence that supports, as well as any evidence that

detracts from, the Commissioner's decision. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A)**,** a person is entitled to disability benefits when the

person is unable to "engage in any substantial gainful activity" because "of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

An affirmative answer to steps one, two, and four leads to the next question. On steps three and five, an affirmative answer constitutes a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

At step three, the claimant bears the burden to show that her impairments meet or are equal to those listed in the Federal Regulations, so as to warrant a finding of disability. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991). When a claimant alleges mental retardation, the Federal Regulations set forth the following four ways that they may satisfy their burden of proof:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; [or] B. A valid verbal, performance, or full scale IQ of 59 or less; [or] C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; [or] D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or

pace; or 4. Repeated episodes of decompensation, each of extended
duration.

20 C.F.R. pt. 404, Subpart P, Appendix 1, 12.00.

In evaluating evidence of mental impairments, the claimant must present documentation

from an "acceptable medical source" of a "medically determinable mental impairment." *Id.*

Mental impairment must be evaluated using a Psychiatric Review Technique form. *Moore v.*

*Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005).

The law in the Eleventh Circuit is well established that the ALJ must accord "substantial

weight" or "considerable weight" to the opinion, diagnosis, and medical evidence of the

claimant's treating physician unless good cause exists for not doing so. *Jones v. Bowen*, 810 F.2d

1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985). An

ALJ's failure to give considerable weight to the treating physician's opinion is reversible error.

*Broughton,* 776 F.2d at 961. However, the ALJ may reject the opinion of *any* physician when the

evidence supports a contrary conclusion. *Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

The Federal Regulations define a "treating physician" as one with whom a claimant has an

"ongoing treatment relationship" or someone the claimant "sees or ha[s] seen with frequency

consistent with accepted medical practice for the type of treatment and/or evaluation required for

[the claimant's] medical conditions." 20 C.F.R. §404.1502. While the ALJ must consider all

medical opinions arising out of a single consultative examination, the consultative examiner is

not owed the special deference awarded to a treating physician's opinion. *Lewis v. Callahan*, 125

F.3d 1436, 1440 (11th Cir. 1997).

Additionally, the Federal Regulations allow an ALJ to consider information provided by

4

the claimant, as "[t]he presence of a mental impairment does not automatically rule [a person] out as a reliable source of information about [her] own functional limitations." 20 C.F.R. §404.1502. The ALJ may use this information in evaluating medical reports, as well as information from other medical service providers, friends, or family; previous work experiences; and the longitudinal character of the evidence presented. *Id.* In evaluating subjective complaints, such as a claimant's testimony regarding the severity of mental impairments, the Eleventh Circuit requires the ALJ to consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged pain." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (emphasis added); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). *See also Turner v. Astrue*, 2009 WL 3048561, *8 (M.D. Ala. Sept. 21, 2009) (applying pain standard to claimant's testimony about the severity of his mental impairments).

## V. FACTS

Claimant was forty-four years old at the time of the administrative hearing. (R. 223). She has an eighth grade education and does not recall enrolling in special education classes while in school. She has not received a G.E.D. nor has she completed any special job training, trade, or vocational school. (R. 69).

### A. Claimant's Applications and Questionaires

Claimant alleges that she suffers from depression and asthma, and that the nerves in her left hand are damaged. (R. 64). She claims that these conditions limit her ability to work because she "[has] seizures, headaches, bronchitis, [and] arthritis," and "memory loss." (R. 65, 74). In her

questionaire regarding her seizures, she asserted that she had experienced seizures her whole life. (R. 88). Additionally, she said she was unable to use her left hand "due to a car accident," and has had two hand surgeries. (R. 65). These conditions began to bother her in September of 2004. *Id.* She stated that she stopped working at that time because she was unable to "sweep and mop 'due to [her] hand,'" and that she has not worked since then. *Id.* In another part of her application, Claimant stated she worked at a fast food restaurant from January 1996 until June 2002 and did housekeeping work in a school from September 2004 until October 2004. (R. 65, 82). She later reiterated that she had held her fast food job longer than any other job. *Id.* In her work history report, she stated she worked at a restaurant in 1980. She alleges an onset of disability as of January 11, 2005. *Id.* She indicated that she had tried to work since then, but did not respond to questions about what happened. (R. 74).

Claimant submitted a daily activities questionaire (DAQ) and a physical activities questionaire (PAQ) on March 11, 2005. Claimant's sister, Mary Boggan, submitted a third party DAQ on the same date. Both Claimant's DAQ and the third party DAQ  indicated that Claimant lived in a house with friends. (R. 71, 90). She stated that she visits with family and friends "once a month" and has no social activities. (R. 73). She was unable to remember why she does not socialize and any difficulties she has experienced doing so. *Id.* Her sister stated that she sees Claimant four or more times a week, and also, that Claimant visits family "once a month." (R. 90-91).

Claimant indicated that she requires assistance with her personal needs and cannot cook or prepare meals for herself. (R. 71-72). She did not respond to questions as to why she is unable to cook or prepare food and who cooks for her; or about the type of assistance she needs. *Id.*

When asked whether she "take[s] care of children, pets, a spouse, or parents, she replied "no." (R. 73, 77).

Claimant sleeps, watches television, and reads in her spare time during the day. (R. 72). In her DAQ, she stated that she is unable to pay attention to the radio and television; watches television shows that last for 30 minutes; and cannot remember what she has heard, watched, or read after doing so. *Id.* She also stated that she never leaves home, but if she does, she rides with someone else. (R.73).

In Claimant's PAQ, she attributed her difficulty performing routine tasks to her inability to grip objects and "arthritis," and also stated that it is "hard [for her] to breathe" (R. 76, 81). She explained that she "can[not] pick [her] legs off the floor" and cannot lift her "arms about the head." (R.77). She did not respond to any questions  regarding her ability to prepare meals or perform household chores, yet indicated that her condition does not limit her in doing yard work or driving a car. (R. 78-79).

Her application indicated that she is prescribed medication for asthma, sleep, headaches, low blood pressure, muscles, arthritis, seizures, acid reflux, and depression. (R. 68). She wrote that she is unable to remember to take her medication as directed. (R. 74). In her questionaire regarding her seizures, she indicated that she takes her seizure medication regularly, as instructed.

Her DAQ and PAQ were completed by Shirley Simmons, Claimant's friend. (R. 75, 81)

### B. Limitations

Claimant's medical records indicate that she has been diagnosed with asthma, depression, arthritis, and seizures. (R. 164). Her mental evaluations indicate that she can "understand,

remember, and carry out short and simple instructions/tasks but not those more detailed or complex tasks." (R. 154; *see also* R. 128). On January 21, 2005, she visited the Neurology Clinic at Cooper Green Hospital and complained of a three year history of migraines. (R. 164). The treating physician noted that she had been to the clinic one year earlier regarding the same, at which time she was instructed to stop taking over-the-counter pain medication and prescribed Imitrex. (R. 164). However, she had continued to take over-the-counter pain medication and requested more prescription medication, as she had run out. (R. 164).

On April 20, 2005, Dr. C.B. Thuss, Jr, an internist and consultative examiner, concluded that the "audibility, intelligibility, and functional efficiency [of Claimant's speech] can meet [her everyday] needs;" 5/5 level grip strength in both hands; a "good, dominant right hand;" and that she suffered from seizures, degenerative knee joints, headaches, anemia, and depression. (R. 117-121).

On April 22, 2005, Dr. John Neville, a consultative examiner, performed a psychological evaluation on Claimant. He reported that she told him she had an "adequate" memory; suicidal thoughts but no attempts; that her last job had lasted about two years as a housekeeper in a hotel; and that she had quit school because of "family problems." (R. 126-127). Regarding her mental status, he observed that her "[i]ntellectual functioning was estimated to be in the mildly retarded to borderline range," and concluded that she had major depressive disorder and mild mental retardation. (R. 128). He did not administer an IQ test.

On June 1, 2005, Dr. William B. Beidleman, a psychologist, performed an intellectual evaluation on Claimant. She informed him that her last job had been three years prior and that her "longest tenure on any one job" had been for five months, tagging clothes at a clothing store.

(R. 156).  He noted that she was "tearful about her mother's death." (R. 157). He administered an

IQ test and Claimant achieved a verbal score of 68, a performance score of 65, and a full scale

score of 64. *Id.*

On June 20, 2005, Dr. Gloria Roque, a psychologist and consultative examiner, evaluated

Claimant using the "Psychiatric Review Technique."  She indicated that the categories upon

which the medical disposition was based were organic mental disorders (§ 12.02) and affective

disorders (§ 12.04) but did not find that the category for mental retardation (§ 12.05) applied.

Evaluating Claimant under § 12.02, Dr. Roque determined that a medically determinable

impairment existed but did not precisely satisfy the checklist for diagnostic criteria, noting that

Claimant's IQ fell within the "mild mental retardation [category] but [that her] adaptive

functioning [was] higher." (R. 139).

Assessing Claimant under § 12.04, she found that Claimant had a depressive syndrome

characterized by (1) anhedonia or pervasive lost of interest in almost all activities; (2) appetite

disturbance with change in weight; (3) sleep disturbance;  (4) decreased energy; and (5) difficulty

concentrating or thinking.   Further, she found that an additional medically determinable

impairment was present that did not satisfy the checklist criteria: single severe depressive episode

"per CE 4/22/05" without psychotic features.  Regarding her functional limitations as a result of

her mental impairments, under section "B" of the listings, Dr. Roque found that Claimant had

moderate restrictions in her activities of daily living; difficulties in maintaining social

functioning; and difficulties in maintaining concentration, persistence or pace.  However, she

found no episodes of decompensation of extended duration and no evidence of "C" criteria of the

listings.  Dr. Rogue's notes indicated that her depression occurred "because her mother died six

9

months prior to the evaluation." (R. 150).

In summary, Dr. Rogue noted that Claimant "has a [history] of depression that responded in the past to meds" and noted that she was currently receiving neither medication nor therapy. (R. 151). In the doctor's opinion, with "appropriate therapy her depression should improve [within] 12 mos." (R. 151). She concluded that Claimant was not mentally retarded, noting that she had no "evidence of lifelong [mental retardation]" and opining that her "current IQ scores may have been depressed by [major depressive disorder]." (R. 151).

Dr. Rogue also performed a mental RFC assessment, finding in all categories that Claimant's functions were either not significantly limited or moderately limited by her mental impairments. She concluded that Claimant could "understand, remember and carry out short and simple instructions/tasks [without special supervision] but not those more detailed or complex tasks." (R. 154). She "needs a flexible daily schedule and a well spaced work setting," "non-intense interaction with co-workers, supervisors and the public," and "tackful (sic) and supportive" supervision. (R. 154). She does not require more than the "usual and customary work breaks." (R. 154).

On June 22, 2005, a consultative examiner, Gwendolyn McCurdy, assessed that Claimant has no exertional limitations and that her vocational profile indicates that she is capable of performing tasks as a tumbler operator and a laundry worker, both at a medium strength and skill level. (R. 95; see also R. 130-137).

Claimant's physician, Dr. Adrienne Carter, submitted a one-page medical information form dated September 20, 2007, with Claimant's food stamp application. Dr. Carter stated that Claimant could not work because of arthritis, seizures, migraines, asthma, glaucoma,

10

anxiety/depression, bilateral carpal tunnel syndrome, and obesity. (R. 217). She also stated that Claimant's condition began in 2006. *Id.*

### C. The ALJ Hearing

After the Commissioner denied Claimant's request for supplemental security income, the Claimant requested and received a hearing before an ALJ on October 4, 2007 in Birmingham, at which time Claimant and an impartial vocational expert testified. (R. 40-43, 220-256).

Claimant testified that she is 5'4" and weighs around 250 pounds. (R. 249). Claimant testified that she had an eighth grade education and was unable to remember whether she had taken any special classes while in school. (R. 223). She stated that she had temporarily held cleaning service jobs, obtained through a temporary employment agency. (R.224-225). She testified that she had not been employed since January 2005, except for working as a cook at Church's, a fast food restaurant. (R. 224). She stated that she "think[s]" she worked there "a couple of months [prior to the hearing], right around the beginning of [2007]" for "[a]bout a week." (R. 224).

She stated that she experienced difficulty performing her duties as a cook at Church's. *Id.* Specifically, she was unable to maneuver large pans, clean certain equipment, and cook the chicken. (R. 224, 226). She explained that cooking the chicken was difficult because she could only use her right hand, as she "had two surgeries on [her left hand and cannot] use [her] thumb at all." (R. 226). She testified that she is right-handed (R. 236) but that she "[cannot] really" grip anything in her right hand because a gunshot bullet shell hit it. (R. 227).

Claimant said finding a job has been difficult, since her week at Church's, because she has "trouble" completing job applications on a computer, reading, and writing. (R. 225). She

stated that she can manually fill out written applications "sometime[s]" but otherwise needs help. *Id.* When asked if she had completed her forms for social security benefits herself, she responded that Mary, her manager at Church's, had helped her because she "[could not] understand certain things on it." (R. 237-238). She claimed that she can only read the newspaper if she holds it up close, even while wearing glasses. She attributed her difficulty reading to "glaucoma in [her] right eye," which she stated she has had "[f]or about the last six or seven years, maybe longer." (R. 225-226). She had visited a doctor about her eyes a month prior to the hearing and she said the doctors had mentioned treating her condition with "some kind of drops." (R. 247-248).

Claimant testified that "the most serious medical problem[s]" interfering with her ability to work are her lower back pain and knee pain because she experiences pain when she "bend[s] over" and cannot stand up for long periods of time. (R. 245, 227). The pain also prohibits her from exercising. (R. 244). Additionally, she cannot sit for more than 40 to 50 minutes at a time (R. 227) and  she "[has] to almost slide to the end of the chair to try to hold onto something to get up" (R. 234). She described her lower back pain as "excruciating" and "aching," as opposed to"stabbing," pain. (R. 228). She testified that she has received treatment from Dr. Carter at Cooper Green Hospital for three or four years prior to the hearing. (R. 249). She explained that she had received a prescription for Propoxyhene, a pain medication, the day before the hearing. (R. 229). She said she experienced pain in both knees, but one was worse than the other (R. 233) and that her doctors have discussed future knee replacement surgery on her right knee (R. 236). Additionally, she stated that she experiences difficulty walking and appeared at the hearing with a cane. (R. 228). She stated that she "primarily" uses the cane for her knee problems (R. 233) and that her doctor had not instructed her to use it; she had gotten it on her own "a couple of months"

12

before the hearing, because her knee was swollen (R. 228) and she lost her balance while walking. (R. 233).

In addition to the pain medication, Claimant testified that she takes medicine for seizures and depression. (R. 229). She stated that her last seizure was six months prior to the hearing, but before that, "it [had] been awhile," because they do not happen very often while she is taking medicine. (R. 229). Contrary to this, she testified that her depression medicine was ineffective, as she has "crying spells...[p]ractically every other day," for no particular reason. (R. 230; *further discussed* R. 247). Claimant has asthma and uses an inhaler about "four times a day." (R. 232-233). She stated that she takes her medicine as directed and has not experienced side effects from any of her medications. (R. 234-235). When asked to explain why her doctors administered a stress test, Claimant testified that she was not sure but that "[she] stay[s] worried all the time." (R. 234). Additionally, she stated that she has experienced difficulty concentrating and remembering things, for "a couple of years." (R. 235).

As to her daily activities, Claimant cannot put on pants unless she sits on the floor because she cannot pick her right leg up. (R. 245). She testified that she has to walk up and down staircases, sideways. (R. 246). Although she tries to wash dishes, she explained that she often drops and breaks them because she cannot hold them. *Id.* She does not sleep well because she worries about bills and taking care of herself. (R. 232). She stated that a gallon of liquid is the heaviest thing she picks up regularly. (R. 236). Her sister takes her shopping and does her laundry. (R. 232, 236). Although she stated that she knows how to drive a car, she had never taken a test to get a driver's license because she is afraid she will have a seizure while driving. (R. 237). As a result, she gets rides from her sister or daughter or rides the Birmingham Transit.

13

*Id.* She does not take naps during the day, but lies down for "about two to three hours." (R. 234). During the day she reads the Bible and watches television from 10:00 a.m. until 3:00 p.m. (R. 243). She goes to church twice a week. (R. 241).

Claimant testified that she has lived alone since her mother died three years ago. (R. 230). When the ALJ recalled and inquired as to whether she had previously lived with a male, Claimant maintained that she had lived alone since her mother died. *Id.* Claimant stated that she rents the house for $150.00 per month and at the time of the hearing, was "[l]ike a year and a half" behind in [payments]." (R. 231). When asked what she lives on, she responded that she "tr[ies] to...get assistance from other people." *Id.* Additionally, she stated that she has received help from certain agencies, such as the Salvation Army and JCC. (R. 239). She explained that she would have to show "disconnect notices before [the agencies would help her] pay[,]" and that she was ineligible for other agency assistance because she was not disabled. *Id.* Claimant testified that she had begun receiving food stamps "about three years" before the hearing. (R. 231, 239). She stated that her electricity was about to be turned off because she was unable to make bill payments. (R. 232). Further, she stated that she has no source of income other than $40.00 she received for participating in a study. (R. 231, 239).

### D. The ALJ's Decision

On April 7, 2008, the ALJ issued a decision finding that Claimant was not disabled under the Social Security Act. (R. 17-30). First, the ALJ found that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (R. 19). Next, the ALJ found that Claimant's headaches, asthma, knee pain, hand pain, seizure disorder, and depression qualified as severe impairments; however, he concluded that these impairments did not singly or

14

in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. (R. 19-22).

Noting the Claimant's IQ score of 64, the ALJ looked to the Mental Retardation Listing of Impairment, § 12.05, and more specifically the subsections that apply to IQ scores of 60 through 70: §§ 12.05C and 12.05D.  Applying the standards under 12.05D[2] of the Listing of Impairments, the ALJ determined that Claimant's mental impairments did not result "in at least two of the following: marked restriction of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (R. 21).  The ALJ also considered whether Claimant met criteria under § 12.05C, which requires, in addition to the appropriate IQ range, a physical or other mental impairment imposing an additional and significant work-related limitation of function.  The ALJ determined that her impairments did not meet that criteria. (R. 22). To support his conclusion, the ALJ referred to the fact that "[n]o treating physician has credibly concluded that the Claimant has an impairment severe enough to meet or equal a listing," and also, that her "mental impairments, considered singly or in combination, do not meet or medically equal the criteria of listings under 12.04 (affective disorders) or 12.05 (mental retardation)." (R. 21).

The ALJ next found that Claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). *Id.* The ALJ noted that "[n]o state agency reviewer/consultant/examiner has opined [that she] is unable to sustain light work," and further

---

[2]Although the ALJ's decision states that he applied the 12.05B standard, this statement was simply a typographical error; he described and actually applied the standard under 12.05D. (R. 21).

noted that "a state agency reviewer found her subject to no exertional limitations." (R. 23) (citing Exhibit C-6f at R. 131). However, the ALJ concluded that "[a] residual functional capacity for light work is consistent" with the evidence because it "gives the claimant the benefit of the doubt with respect to her work related physical limitations." (R. 23).

In support of this conclusion, the ALJ pointed to a consultive examiner's finding on April 20, 2005 that she "should not be required to lift or carry more than 35 pounds." *Id.* Additionally, the ALJ referred to evidence regarding Claimant's mental limitations and determined that the objective medical evidence corroborated Dr. Roque's findings on June 20, 2005, that Claimant could "understand, remember, and carry out short and simple instructions and tasks," and was able to "sustain workdays with customary work breaks; tolerate non-intense interaction with co-workers, supervisors, and the general public; receive supportive supervision; and tolerate gradual changes in the workplace." *Id.* The ALJ also "considered treating physicians' assessments of Claimant's ability to work." (R. 23). Specifically, the ALJ looked at Dr. Adrienne Carter's statement, dated September 20, 2007 which was initially "provided [...] in order to help the Claimant obtain food stamps," that Claimant could not work due to "arthritis, seizures, migraines, asthma, glaucoma, anxiety, depression, bilateral carpal tunnel syndrome, and obesity." *Id.* The ALJ decided not to give the statement great weight because Dr. Carter had "not describe[d] specific work-related limitations that would be severe enough to render [Claimant] unable to sustain heavy, medium, light, or sedentary work," and "simply [did] not show that [Claimant's] combined impairments are severe enough to render her unable to sustain substantial gainful activity." *Id.* The ALJ stated that "[t]o the contrary, the treatment records generally indicate [that Claimant's] overall condition has remained stable," giving "greater weight" to Dr.

16

Roque's findings. *Id.*

The ALJ next considered Claimant's subjective allegations of symptoms in determining that she has the residual functional capacity to perform light work. The ALJ applied the pain standard and found that Claimant's "medically determinable impairments could not reasonably be expected to produce most of the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of theses symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (R. 26). The ALJ concluded that "Claimant is simply not a credible witness." (R. 28).

To support his conclusion, the ALJ first referred to Claimant's previous disability applications, which had been unsuccessful. (R. 26).  In particular, the ALJ focused on her most recent applications, submitted in 1999 and 2001, in which Claimant had alleged that she was disabled by impairments similar to those set forth in the application at issue here. (R. 26-27). In 1999, the presiding ALJ decided that she had not received treatment for depression and "with regard to the alleged hand pain [...] noted that [she] would be expected to return to work in two or three months."  Also in 1999, Claimant "admitted" that she had not received treatment for seizures. (R. 26 (citing Ex. 5f)). Likewise in 2001, the presiding ALJ "found [that] the objective medical evidence did not support the degree of pain and limitation alleged," even though at that time, Claimant had attended group therapy for depression. (R. 26-27). Regarding Claimant's current disability application, the ALJ "note[d] that although [she] appears to have been prescribed anti-seizure medications, the file does not indicate that [she] has been evaluated for seizures," nor does it show "EEGs or other tests [that confirm] that she continues to suffer seizures." (R. 26).

17

The ALJ assessed that the "only difference in the current case is that [she] now alleges she has mental retardation and listing-level depression," and accordingly, considered the evidence offered to support the new allegations. (R. 27). The ALJ noted that "[Claimant's] attorney was unable to obtain school records that would presumably corroborate her assertions that she is mentally retarded," and Claimant testified that she did not enroll in special education classes. *Id.* The ALJ evaluated the evidence offered to show Claimant's alleged depression and found no evidence that she had "received any formal treatment for mental illness," and her "treatment notes repeatedly indicate [that she] exhibited no abnormalities of mood or affect." (R. 27 (citing R. 166-177)). The ALJ also considered records showing that Claimant was diagnosed with mild mental retardation on two separate occasions. He did not give either diagnosis great weight because the "examiners saw [her] only once," and "the diagnoses [were] not supported by the general evidence or by [her] level of functioning, especially since the allegations of mental retardation were only recently raised." (R. 28). Further, the ALJ noted that the record from a previous application included evidence that Claimant had "told the staff of Cooper Green Hospital on February 4, 2000 that her attorney had told her to get a diagnosis of depression in order to bolster her disability claim." (R. 27 (citing Ex. 12f (a prior file))). The ALJ further explained that "[e]ven if she has mild mental retardation, the evidence indicates her adaptive functioning is much higher according to her [daily activities] and other information contained in the [physical residual functional capacity assessment]." (R. 27) (citing R. 139)). The ALJ also pointed out that "she reported a much broader range of activities of daily living during the hearing than she did when sitting for consultative examinations." (R. 28).

The ALJ pointed out numerous other inconsistencies between the medical records and

Claimant's testimony and allegations. The ALJ found no medical evidence that Claimant has

glaucoma, or even blurry vision, despite her testimony that she suffered from both. (R. 27).

Likewise, the ALJ found that medical evidence contradicted her alleged knee and hand problems.

*Id.* The ALJ found no medical evidence that she is "unable to use her hands, unable to wash

dishes, or unable to stand or walk for at least a total of six hours per workday." *Id.* Medical

records showed that Claimant had "good manual dexterity;" and, regarding her right hand,

"revealed nothing more than mild osteoarthritic changes" and "a deformity of the 5th metacarpal

but no evidence of a fracture." *Id.* Concerning her knees, the ALJ stated that the medical

evidence only shows "some degenerative changes of the knees but no acute or serious

degenerative processes," and "does not show that she has been found to chronically have fluid

[around her] knees." The ALJ observed that Claimant's records showed "normal hearing; 20/70

binocular vision; a normal spine; bilateral grip strength of 5/5; strength of 5/5 in all extremities;"

that she "regularly exhibited normal gait and station;" and that her asthma "is controlled with

medication and has not required frequent emergency treatment." *Id.*  The ALJ also found that

Claimant's medical records failed to show evidence of " degenerative disc disease or any other

condition that would cause her to feel bad back pain." *Id.*

    Furthermore, the ALJ concluded that Claimant cannot perform past relevant work but that

"there are jobs that exist in significant numbers in the national economy that [she] can perform."

## VI. DISCUSSION

    Claimant argues that the ALJ failed to properly consider her alleged mental impairments,

either singly or in combination. The court disagrees.

    Substantial evidence supports the ALJ's finding that Claimant does not have an

impairment that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926). As previously mentioned, the ALJ applied a five-step sequential process to evaluate a disability claim. Step three of that process is at issue here. At step three of the process, Claimant bears the burden to show that her impairments meet or are equal to those listed in the Federal Regulations. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991).

In this case, the ALJ correctly determined that Claimant did not meet step three of the five-step process because her alleged impairments did not qualify under 12.05C and 12.05D. Claimant did not present evidence that her alleged impairments fell under 12.05A and 12.05B.[3]

The ALJ properly discounted the medical evidence offered to support Claimant's mental impairment allegation. While Claimant's "treating physician," Dr. Carter, opined that Claimant suffered from depression, she did not diagnose Claimant with mental retardation.[4] The evidence submitted to show Claimant's mental impairment were reports of Dr. Neville and Dr. Beidleman from their consultative examinations in 2005. Both concluded that she was mildly mentally retarded. The ALJ gave little weight to these findings because the "examiners saw [Claimant]

---

[3] *See* footnote 2.  Although the ALJ's decision states that he applied the 12.05B standard, this statement was simply a typographical error; he described and actually applied the standard under 12.05D. (R. 21). The ALJ's failure to apply 12.05B has no effect to the extent that it might render his decision invalid because 12.05B is inapplicable, as it requires that the claimant exhibit an IQ of 59 or less. Claimant scored a 64 on the only IQ test in the record, which was performed by Dr. Beidleman. (R.156).

[4] Even so, Dr. Carter's medical report, submitted along with Claimant's food stamp application, was simply a list of diagnoses. It did not describe any tests or evaluations performed and did not provide any basis for her conclusions. Interestingly, Dr. Carter's report is unreliable because it states that Claimant has suffered from arthritis, seizures, migraines, asthma, glaucoma, anxiety/depression, bilateral carpal tunnel syndrome, and obesity *since 2006.* Although the ALJ may consider evidence submitted after the application is filed, it is notable that Claimant has alleged the same or similar impairments in at least two previous applications.

only once," and thus, neither qualified as a "treating physician." As such, the ALJ is not required

to defer to their opinions, as he would a "treating physician's." *See Lewis*, 125 F.3d at 1440.

Also, the ALJ acted within his discretion in discrediting the consultative examiners' findings on

the grounds that "the diagnoses [were] not supported by the general evidence or by [her] level of

functioning, especially since the allegations of mental retardation were only recently raised." (R.

28). The ALJ further explained that "[e]ven if she has mild mental retardation, the evidence

indicates her adaptive functioning is much higher according to her [daily activities] and other

information contained in the [physical residual functional capacity assessment]." (R. 27) (citing

R. 139)). Additionally, the ALJ pointed out that "she reported a much broader range of activities

of daily living during the hearing [in 2007] than she did when sitting for consultative

examinations [in 2005]." (R. 28).

   This court finds substantial evidence to support these findings. Although she testified that

she has trouble understanding reading material, including job applications, Claimant testified that

she reads the Bible and does puzzles. (R. 243). Also, Claimant initially indicated in her

application that she only socialized once a month, whereas she testified in 2007 that she goes to

church twice a week. (R. 73, 143).  Notably, Claimant testified that she was physically unable to

perform her most recent job as the cook at Church's, which she claims was at the beginning of

2007, because she has limited movement of her hands, not because she cannot understand

instructions. (R. 237-238).

   This court notes three additional reasons supporting the ALJ's decision not to defer to the

decisions of Dr. Neville and Dr. Beidleman. First, the information about work history that

Claimant provided to Dr. Neville in April 2005 was inconsistent with the information she

21

provided to Dr. Beidleman in June 2005 and also conflicted with the information on her DAQ and PAQ applications in January and March of 2005.  Claimant's stated in her DAQ and PAQ applications that she had previously worked at a fast food restaurant from January 1996 through June 2002 and as a school housekeeper from September 2004 through October 2004. She reiterated, in response to a separate question in her application, that she had held the fast food job longer than any other job. (R. 65). A few months later, in April 2005, she told Dr. Neville that she had last worked for two years as a housekeeper in a hotel. (R. 126). Two months later, she told Dr. Beidleman that the longest job she had ever held was for five months tagging clothes at a clothing store. (R. 156). That inconsistency calls into question her credibility and also the conclusions of Dr. Neville and Dr. Beidleman based on the information she provided.

Second, Dr. Neville concluded that Claimant was mildly mentally retarded *without performing an IQ test*. Third, although Dr. Beidleman conducted an IQ test, its accuracy is called into question by the fact that, later the same month, Dr. Roque observed that Claimant's IQ appeared to be higher than the test reflected and that her major depressive disorder had possibly hindered her performance on the IQ test examination. (R. 151). Claimant's depression –  which Dr. Roque opined should clear up with therapy within a year – could explain the discrepancy between her IQ score and the conclusions of Dr. Roque and Dr. McCurdy; even Dr. Beidleman had observed that Claimant was "tearful about her mother's death" while he administered the IQ test. (R. 157).

The ALJ also properly considered information provided by the claimant, as "[t]he presence of a mental impairment does not automatically rule [a person] out as a reliable source of information about [her] own functional limitations." 20 C.F.R. §404.1502. The ALJ may use this

22

information in evaluating medical reports, as well as information from other medical service providers, friends, or family; previous work experiences; and the longitudinal character of the evidence presented. *Id.* In evaluating subjective complaints, such as a claimant's testimony about the severity of her mental impairments, the Eleventh Circuit requires the ALJ to consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged pain." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (emphasis added); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). *See also Turner v. Astrue*, 2009 WL 3048561, *8 (M.D. Ala. Sept. 21, 2009) (applying the pain standard to claimant's testimony about the severity of his mental impairments).

The ALJ concluded that Claimant was not credible. Claimant's inconsistent statements about work history to Dr. Neville and Dr. Beidleman likewise support this conclusion. Further, the ALJ properly considered the record from a previous application showing that Claimant had "told the staff of Cooper Green Hospital on February 4, 2000 that her attorney had told her to get a diagnosis of depression in order to bolster her disability claim." (R. 27 (citing Ex. 12f (a prior file))). Additionally, Claimant testified that she has lived alone since her mother died, yet she and her sister, in her third party DAQ, indicated that she lived with friends. (R. 71, 90, 230).

Claimant argues that the Eleventh Circuit's ruling in *Davis v. Shahala,* 985 F.2d 528, 534-35 (11th Cir. 1993), applies here and requires this court to reverse. In *Davis*, the court determined that the combination of claimant's allergies and mild carpal tunnel syndrome satisfied step three of the evaluation process and constituted a disability. The district court had

23

already accepted the objective medical evidence of both impairments, but had only considered

them singly in finding that they did not meet 12.05(C). Thus, the primary issue facing the court in

*Davis* was whether an ALJ was required to consider the combination of claimant's impairments

under 12.05(C). After determining that the ALJ was required to do so, the court took an extra

step and ordered the lower court to grant disability benefits because the ALJ had already accepted

the objective medical evidence and concluded that the claimant suffered from both impairments.

*Id.* This case is distinguishable from *Davis* because credibility problems exist regarding the

medical evidence offered to support Claimant's mental retardation claim, and also with her

testimony. No such credibility problems existed in *Davis*.

     For the reasons stated above, this court finds that substantial evidence exists to support

the ALJ's decision to give little weight to the consultative examiners' opinions that Claimant

suffered from mild mental retardation. Further, the ALJ properly concluded that Claimant's

alleged mental retardation, either singly or in combination with other impairments, does not meet

or amount to those impairments listed in the Federal Regulations.

## VII. CONCLUSION

     For the reasons stated in this opinion, the court concludes that substantial evidence

supports the decision of the Commissioner and, thus, it is due to be AFFIRMED. The court will

enter a separate Order consistent with this opinion.

     Dated this 18th day of November, 2009.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

24